May it please the Court. The cornerstone of the Fourth Amendment is reasonableness. And that certainly applies to the questions here. First, would a reasonable person hemmed in by cars and two marked police vehicles feel free to leave? And did officers have reasonable suspicion to seize Mr. Williams based on an uncorroborated anonymous tip? The answer to both of these is no. First regarding the seizure itself, you raised a factual and a legal question. I'm going to start with that legal question. As this Court knows, a person is seized when officers use force or a show of authority to demonstrate to someone that their liberty has been restrained. And the Court asks, would a reasonable person under the totality of the circumstances feel free to leave? So here, what are the totality of the circumstances? Mr. Williams and his passengers were backed into a parking spot with cars on either side, immediately on either side. When two marked police SUVs pull into the parking lot in the center of the driving lane, and one, the first, partially blocking the front of Mr. Williams's vehicle. The second officer parked a car to length behind the first officer. So for purposes of this legal argument, you're accepting the district court's factual findings? Judge, we did argue that the court made clearly erroneous findings. But this court doesn't have to agree with that argument. That's not dispositive in this case. Oh, sorry. That was a question. I meant to put a question mark at the end. So for the purposes of this legal argument, you're accepting the district court's factual findings? Yes, Judge. Okay. So you're not arguing it was clearly erroneous to conclude that the patrol car did not block in the defendant's car. The defendant could get out of the parking space. The district court found that Mr. Williams would be able to freely drive to the left or to the right. He didn't make a finding about whether he was blocked in. And this court does not have to agree with us for the legal purpose that Mr. Williams could drive to the left or right once out of that parking spot. Our position is that, and Officer Pistone actually agreed as well on cross-examination, that his car was blocking that driving path to the left. And when the court looks at the photos that are in the briefs, but also in the body-worn videos, the court can see that Mr. Williams would have had to have taken evasive action or maneuvered in a way, a multi-point turn, that this court has found constitutes essentially hemming him in or blocking him in. That's not what the district court held, right? The district court said he could pull out either direction. And the officer testified he could pull out either direction. And the photos show he could pull out to the right with no maneuvering. So if we accept that, then do you have an argument that as a legal matter, he still wouldn't have felt that he could leave? He would have felt the officers were there for him and he couldn't leave. Even if we accept Your Honor's fact pattern, yes, Judge, and yes, the position, our position is that even under those circumstances, Mr. Williams would not, he was not free to leave. He did not feel free to leave. A reasonable person would not feel free to leave. When you have these two marked police vehicles. The other car felt free to leave, right? One car left. Yes, Judge. And that black car that Your Honor is referencing, there are two points there. First, that black car had more space to both the left and the right to maneuver out of its parking space. So it wouldn't have had to have taken a multi-point turn to get out of its parking space. It didn't have to. You can see it in the video. There is an empty space next to the black car. I'm sorry? There was an empty space next to the black car? Yes, Judge, there were. When you watch the body worn videos, you can see, specifically rather, Officer Wilson's body worn video, you can see that there's ample space to the right of the black car and there's space to the left of the black car as well. So it was able to get out of its parking space. In addition to that, the second point is, by the time that black car was leaving, Officers Wilson and Pistone were already focused, I'm sorry, Wilson and Pistone were already focused on Mr. Williams. In fact, Pistone, Officer Pistone was taking Mr. Williams to his vehicle. So at that point, the driver of the black car understood he was not the target of the investigation. Somebody else was. So he was free to leave at that point. But the second... And was the black car, in addition to not being as hemmed in as Appellant's car was, the black car was also smaller than Appellant's vehicle, right? I believe that's correct, Judge. I don't have the measurements and I certainly don't have the... Oh, I actually do. ...but it looks smaller, yes. Because my law clerk looked it all up. Yes. It was a Ford Fiesta. It was. It does appear, yes, Judge, to be a smaller vehicle. And as the court can see in the videos, it did not have to take evasive action or maneuvering to get out of that particular parking spot. The officers also, in the way they parked, this draws a distinction from the Watkins case, which the government cites in its reply in support of its position, but actually it shows what these officers could have done or should have done in this particular case. Officers in Watkins parked on the far side of a driving lane in a parking lot and three car lengths down from Mr. Watkins. Here, if officers wanted to communicate to somebody that they were free to leave, they could have done that. You said there was only one police car in Watkins, right? Yes, Judge, that is correct. And there's two here. Yes, Judge. That is absolutely right. So this court... So this is a parking lot and there are multiple cars and there's a driving lane and it's in a housing complex and two officers pull up, no sirens, no lights or anything, two cars pull up, marked police cars, and they stop on one lane of the driving lane. It's kind of a two lane road. They're stopped there. They're not blocking any of the cars in the parking lot. They stop in front of one of the housing complex's buildings. So your argument is or has to be that by pulling up and stopping that someone in that parking lot or someone in that housing complex feels particularly singled out that I am not free to leave. I am being seized by the police individually. So who is it? Is it all the cars in the parking lot? Or is it someone in the housing... I mean, why are you drawing the line where it is? It seems to me that... I mean, you cite these cases about it's seemingly at random. This does seem at random. It's not a patrol. Clearly, the officers are there for something in the housing complex, but an innocent person in the parking lot, you know, if this fellow was about to go get groceries, I mean, if the officers pulled up, he would have thought, hmm, something going down in the apartment and he would have pulled out and gone to get his groceries, right, because he could. So who is it that should have felt seized and why? Judge, certainly if the officers had parked on the far side of that driving lane where they did park, maybe a reasonable person would think, oh, they're here for some reason. But these officers parked in the middle of the driving lane, which is unusual. They were together, which communicates, as Your Honor acknowledged, that there was something going on. And that first vehicle, Officer Pistone's vehicle, parked perpendicular and partially blocking the front of Mr. Williams' car. So a reasonable person in that position is left to believe that the car blocking me is here and focused on me, that I'm the target of the investigation. What about all the other cars in the parking lot next to him? My colleagues just pointed out there were cars on either side of him. There's a car further down. They're all seized. There was nobody in those vehicles, Judge. But if there had been? If there had been, potentially there would be a different scenario, and potentially those individuals would have also been, would have felt not free to leave. Here we have Mr. Williams, who was the only individual. Wasn't there also somebody standing next to the car that ran, that ran away as the police drove up? Judge, I don't recall that from the record. And if there was, and if that person had been our client, then I imagine we would have an acquiescence issue. Somebody named Frank. I'm sorry, Judge? Somebody named Frank. When, in the video, the officer asks the appellant, who was the guy that pretty much sprinted out of here when we pulled up, and the appellant says, oh, Frank. He was standing outside the car. I thought that was in the video. Maybe not. That may be, Judge, and perhaps I missed it. And that would actually go to our point that Mr. Williams did not feel free to leave. He did not leave. And he certainly acquiesced to that short report. And it would go to that point, but then I think it may cut against you on the reasonable suspicion even assuming that there was a seizure at the point they drove up, then if there's somebody that runs away right when the police drive up, that adds to the reasonable suspicion of not only they have the call and then they find people that match the description in the call. It potentially would, Judge. I would point out the government hasn't made that point. The government hasn't argued that. In addition to that, Judge, going to . . . I know. That same law clerk that found the Ford Fiesta also found Frank. Very diligent law clerk, Judge. But wouldn't that be reasonable suspicion as to Frank? He's the one that took off running. Yes, Judge. Not necessarily Mr. Williams. Thank you. Yes, Judge, he . . . But Frank felt free to leave. I mean, if Frank is a real guy, he felt free to leave, right? And everyone else should have felt free to get out of that car and leave too. Maybe don't run because that's suspicious, Frank. But then how does that help you? And he was also standing right next to Appellant's car. He was with Appellant. Yes, Judge. So there are two issues there. First, the individual, again, who ran . . . I don't know Frank. I don't know what led him to run. But what I can say is that the fact that he ran indicates . . . and the fact that Mr. Williams didn't . . . indicates that Mr. Williams was acquiescing to that show of police authority. He did not bail out of a car. He did not get out of a car and leave. He may have been too high to run. I mean, wasn't that the issue? Judge, I'm not sure. They didn't do roadside. I know they indicated that they did smoke something. They didn't say when. That was certainly after the seizure. Regarding the anonymous tip and, Judge Thacker, your concerns, I believe that Judge Benjamin actually pointed out a very good point, that that may go to reasonable suspicion as to the individual who left. That headlong flight would have maybe caused some suspicion about him. But in terms of the anonymous tip, we have . . . The court had to find some illegality . . . I'm sorry, not the court. The officers, rather, had to corroborate the illegality of that call. Was there actually any sort of illegality? An individual running when the cops come, that's unclear. The cops didn't say that they suggested that there were hand-to-hand transactions happening. And, actually, the information that they learned, albeit after the seizure, was that there was no indication of hand-to-hand transactions. So the officers relying on that anonymous tip, an individual running away at most, certainly didn't corroborate it enough for a seizure in that moment. Again, the officers could have done what they did in Watkins. They could have parked further away and engaged in a citizen encounter, and they simply didn't do that in this particular case. Does it matter that the officers didn't have on the sirens or lights when they pulled up? That's something the court . . .  I'm sorry? In terms of the seizure. That's certainly something the court can take into consideration, but we know from this court's opinion in Jones that that is certainly not dispositive. The officers in Jones hemmed in, they did not have on their lights and sirens, and the court still found that Mr. Jones was actually seized in that particular situation. Would you say Jones is your best case for why this case is a seizure? Yes, Judge. And that's the case where it's a one-lane road, right? And the officers blocked the lane of travel, and he would have had to back out and back down going the wrong way to get out. That was Jones, right? That was Jones, yes, Judge. And in one of the footnotes, I believe it's footnote four, the court acknowledged that the government argued, well, he wasn't actually blocked in, he could have backed out, and the court there said if someone has to take evasive action, they're not going to do that in front of police officers, and that does suggest that they were seized. And, again, that's what Mr. Williams would have had to have done. He would take evasive action or maneuver his car in a way that a person just would not do. And that's come at a dispute with the district court's fact findings, right? That pulling out of the parking space would have had to require evasive actions. The one moment. Which you can do. It's just a high standard, right? We have to find clear error. If we're talking about the factual question, yes, Judge, it is clear error. The district court found that Mr. Williams would have been able to drive to the left or to the right. The court did not make any findings about any maneuvering he would have to do to get out of the parking spot, to go to the left or to the right. It may be possible that Mr. Williams could have eventually gotten out of that parking spot, but in order to do so, he would have had to have taken a multipoint turn. And, again, the court in Jones. I have to. You're saying I don't have to find clear error, but I have to accept your description instead of these pictures, right? That he couldn't pull to the right. Judge, no. The video, right? The video, I mean, I can see on the video what he could do, and the district court made a finding. But your argument is the video doesn't accurately show it, and the district court's factual finding is not correct, that he couldn't have pulled out at least to the right. It would have required lots of maneuvering, even though he was backed in. Our position is, and I apologize, I see I'm over my time. You can answer. Thank you. The district court's findings don't reach the ability of Mr. Williams to maneuver in or out of that parking spot. But even if the court believes that it does or finds on its own that it does by watching the video, the fact that these two marked police units parked in the way that they did was a show of authority. And a reasonable person would not have felt free to leave under those circumstances. All right, thank you. Ms. Wood? Good morning. May it please the court, Julia Wood on behalf of the United States. I want to start just by talking briefly about the footage. You mentioned Judge Thacker about Frank. That is at, I noticed it in my preparation and review, it's at 1925-47 of Exhibit 6. And the officer does ask, who was that guy who basically just took off running when we pulled up? And he said, that's my friend Frank. I think that does go to the reasonable suspicion, if this court were to find that there was a seizure. The call, the 911 call said that there were. And yet the government in its briefing doesn't mention Frank and him running away anywhere. So all you have in your briefing on reasonable suspicion is an anonymous phone call, and then people matching the description of the tip. That's right. We did not raise the issue of Frank. Because that would be reasonable suspicion against Frank. That's probably why you didn't raise it, because the reasonable suspicion would be against Frank. Well, it didn't come up at the suppression hearing. I think it does go to reasonable suspicion when you have a 911 call that's alleging drug transactions and it was reasonable for the officer to infer from the information that the 911 dispatcher gave him that that was a contemporaneous report. Wasn't Frank standing outside Appellant's vehicle before he fled? That is what they said. But that would be consistent with a drug transaction of, you know. I thought he just asked who was that guy that took off sprinting. I don't know if it was ever a conversation about where Frank was standing. Yeah. Their appellant responds and he says, oh, Frank. And then he says he's from here, too. He wasn't in the car. He was standing outside. It's about 45 seconds later they're talking about where Frank was standing. Because he said, was he in the car, too? And he was like, no, he was standing outside the car. But I think that when you have this 911 report that had sufficient indicia of reliability, that that would add to the reasonable suspicion. How is the 911 report reliable? It's anonymous, and we have case law in this circuit. It's anonymous. We don't know who the person is. He says there's a car and there's some, I think he says some light-skinned black dude in the car. And they may be doing something illegal. He doesn't even say what they are doing that is illegal. He says they may be doing something that's illegal. How is that reliable? Well, for sure. Under our case law. Under Navarrete and this court's decision in Kehoe, I think it does have, this court has said in Perkins that anonymity of the call is a spectrum. Not every call is either anonymous or non-anonymous. This one had those four indicia of reliability. It was placed to a 911 call, and it was therefore traceable. The caller was saying, it appears that they are doing drug transactions. They're currently parked by the pool. There are three to four people in the car. I don't see any weapons. Those are all indications that he's an eyewitness and that he is seeing things that lead him to believe that they're doing drug transactions. And he also, the officer corroborated some of the key details of this call when he arrived on the scene. There was a white Mercedes Benz with a light brown-skinned man with braids in the car, and it was parked by the pool. So they did corroborate that information.  And that's not, it doesn't go to the illegality of what the caller observed, but the Supreme Court has said in Alabama v. White that if you corroborate some aspects, then the caller is more likely to be telling the truth about other aspects of the call. But I would like to get back to whether, or get to, whether a reasonable person would have felt free to leave in Mr. Williams' position. The district court did not clearly err when it found there was room for him to drive away either to the left or to the right. I think the body-worn camera footage shows that, and the district court relied on that footage. But wouldn't it, but the district court did not discuss, the district court did not discuss if he would have had to maneuver to go to the right or to the left. And from my viewing of the video, there would have been some maneuvering to go to the right or the left. Is that not clear? The district court didn't have to consider whether, or didn't have to state on the record whether he would have had to maneuver. His finding is plausible in light of the record, and that is all this court needs to find, to find that he did not clearly err. And in Watkins, which I think is on point with this case, the car would have had to back out before it then left the parking lot. But this court found that he was not, or affirmed, and found that he was not blocked in. Yeah, but in Watkins, if I'm remembering correctly, the police officer pulled in three spaces down. So it's not in front of the vehicle. That's correct. I think if you- And it was only one police officer, not two police officers that arrived simultaneously in a high crime area. And that is the key difference with Watkins, is the one officer versus two officers. But I still think, to Judge Rushing's point, that when two officers arrive, they don't have their sirens on. They don't have their lights on. Because it's multiple officers arriving at the same time and partially blocking the vehicles. Where they parked is different than where the one officer in Watkins parked. But I don't respectfully think that they partially blocked. Officer Pistone pulled his vehicle past the white Mercedes, and then Officer Wilson was on the other side of the white Mercedes and on the right side of the driving lane. So there was room to drive away, and that black car, which may have been a bit smaller than the white Mercedes, but it was able to pull away. And, well, not only was it smaller, it didn't have cars next to it in the way that Appellant's vehicle did. Right. But there was, it wasn't really a tight wedge. There was room on either side of that white Mercedes. One of the doors was opened without hitting the car beside it. So there was, and the police cars, when you look at the footage. But really, I guess we're, I feel like we're getting a little bit afield, because the question is not whether he physically could have made it out of there. The question is whether he felt like he could even attempt to leave. And I think he could. But all of this goes to whether he could have, whether he would have felt free to leave, because the officers did park in a way that left him room to simply drive away. What about the fact that it's a high crime area? So people that live in that area, and I think he said he's from, Appellant's from the area, already know that the police are suspicious of every movement, even just sitting in a car next to the pool. Does that play into whether he would have felt free to leave when two police cars roll up and park in the manner that they did? I think it actually could cut in the other way, that there was no reason for him to believe that he was specifically being targeted. If this is a high crime area, the police officers could have been there to investigate someone else in the building. And this court has said that this is an objective test. It's more about what the officers are doing, their show of authority, whether they are giving that requisite show of authority where somebody would not have felt free to leave. And in this case, where they drove up, no sirens, no lights, they did park on the right side of the driving lane and leave room. And I do want to, you know, my friend does not challenge that they smelled marijuana when they opened the door. So we're talking about a short- Right, but if they were seized already, if they were seized right from the get-go, then opening the door doesn't really matter for reasonable suspicion. Right, that's exactly right. But we're talking about that. I'm trying to find out, if I do think that they were seized right from the get-go, that an appellant was seized right from the jump, then what are the indicia of reasonable suspicion I should be looking to at that point? At that point, I think we have the 911 call, which does have those indicia of reliability under Navarette and Kehoe. The corroboration of the details of that 911 call also rendered it more reliable. And we have that it's a high-crime area, which I understand, under this court's precedent, standing alone- Well, I don't know how you say it's reliable because it says if it's an anonymous call, it seems as if the case is stated in that, then the assertion needs to be pretty definite, right? If you look at the Supreme Court, I think it's Florida v. J.L. I mean, those cases that assertion of illegality, this guy says, basically, they may be doing it. I don't know what they're doing. They're just sitting out there, but they may be doing something. So that doesn't seem to be, to me, very reliable. He's not saying I saw them, I see them out there selling drugs, I see someone doing a hand-in-hand transaction. It seems as if you would need something more than just these guys are sitting in the car, one of them is light-skinned with braids in his hair, and they may be up to something illegal. So two points. When the caller called, he said, these cats are out here selling drugs. And then later on, he said, I think they're doing a drug transaction. But he first said, these cats are out here selling drugs. And during the call, he actually said, I've told them before. So he had some, and he said he lived in the complex. So he had some previous history of seeing this kind of conduct. But he doesn't say that he's witnessing a drug transaction. Not a hand-to-hand transaction, but I think it's certainly reasonable for the officer to infer, based on the information that he had, that this was an eyewitness account. He said it appears that they're making drug transactions. They're currently by the pool. Did that information go to the police officers? That information did. He had not listened to the 911 call, but he did have the call for service that had, the language was advised the same, appears to be making drug transactions, currently near pool, has three to four occupants in the vehicle, no weapons seen, which all, it was reasonable for Officer Pistone to infer that this was an eyewitness account, and it was contemporaneously happening. I also want to draw a distinction with Florida v. J.L. In that case, the weapon that the tipster had called about was concealed, and he didn't give any basis of knowledge. There was no way for him to know that this person was carrying a gun. But in this case, you can see drug, you know. The witness doesn't say that he sees there's a hand-to-hand drug transaction? He didn't say that there was a hand-to-hand drug transaction, but when he called, he said, these cats are out here dealing drugs. But that wasn't given to the police officers that arrived on the scene. That part of the conversation was not, that's not what was told to the police officers that arrived on the scene. Well, the call for service said advised the same, appears to be making drug transactions. Appears. It looks like the CAD sheet says drug sale slash purchase, suspect on scene, right? Yes, that's correct. And that's at JA 59. That's what the officers were told. Yes, that's what the officers were told. So they had that information. They also had the information that it was a 911 call. And so, you know, under the Supreme Court's precedent and this court's precedent, because he called 911, that makes it, and the district court also found that that made this more of a traceable call. Let's see, the high crime area, again, standing alone, that would not be enough certainly for reasonable suspicion, but it does play into the analysis under the totality of the circumstances. Does Frank matter at all for the reasonable suspicion analysis, assuming that the seizure occurred right from the beginning? I think Frank does matter because this court can affirm on any grounds found in the record. I think it adds to the reasonable suspicion that once the officers drove up to investigate a call for service of drug transactions, there was a man standing at the identified car and he took off. I think that is suspicious behavior that could play into the reasonable suspicion analysis.  As to Frank. And I would argue to the entire car, because if Frank is running away and we have a call for service on drug transactions, I think it's a reasonable inference that perhaps Frank and Mr. Williams or the occupants of the car were engaged in a drug transaction. But no one ran after Frank. Nobody ran after Frank that we are aware of. I do want to just address very quickly, the district court didn't clearly err when he found that he could drive to the right or the left, and also there were many non-evasive ways that Mr. Williams could have left. It would not have required evasive action for him to simply drive off to the right if driving past a police car were evasive action, then people would be seized any time a police officer pulled up in their vicinity. So I just did want to make that point. But if the court has no further questions, we would ask that you affirm. All right. Thank you. Thank you. Judge Thacker, Frank matters. And so far, as Your Honor pointed out, this is a high-crime area where people are potentially afraid of the police. This individual ran. That is all the officers know. But what we do know from JA120 is that Officer Pistone said, he testified, that he was responding, he and Officer Wilson were responding to possible drug transactions. They did not know that there was any sort of eyewitness account of confirmed drug transactions or that anybody said there were drug transactions happening. Is the word possible? You're relying on, is that from his testimony? You're pulling that from his testimony in front of the court? Yes, Judge. So was he saying, I did not know at the time? He said he was responding to possible drug transactions. Yes, Judge. But he didn't disavow the CAD, right? You seem to be saying that he said he didn't know there was an allegation of a drug sale, that he just thought it was possible. Yes, Judge, that's correct. He said that he was responding to possible drug transactions. Even though the communication that he had says, same, appears to be making drug transactions? Yes, apparently, Officer Pistone's interpretation of appears means possible. Yes, Judge. You seem to be putting a lot of emphasis on the way he said it in his testimony, right? I was responding to a possible drug transaction. That doesn't mean that the CAD, I mean, it says we can read it, right? It says drug sales last purchased, suspect on scene. Yes, Judge. That's what he was told. He was told that there appears to be drug transactions and that he testifies that he understood that to be possible drug transactions. He didn't say understood that, but that's his testimony. And he testifies that when he arrives, he acknowledges, he doesn't testify he doesn't have reasonable suspicion, but he acknowledges that he's there to investigate. Yes, he testified he would have let him go if he had gotten out of the car and walked away or driven off. That was his testimony. He said, I would have let him go. That was Officer Pistone's testimony, yes. So as that goes to whether or not he had reasonable suspicion, we understand that to mean he did not have reasonable suspicion when those cars stopped. And based on the anonymous call and based on the Supreme Court's cases in Navarrete and Florida v. JL, we understand that those officers had to corroborate the illegality of any sort of behavior that was recorded. They can't just use identifying information as the corroboration. So my friend talked about the corroborating information of these individuals in a white car in this particular parking lot by the pool. That's not enough. They had to corroborate some sort of illegality, and they just didn't do that before the seizure. In addition to that, the government argues that the call was traceable. The district court mentioned, well, this was a 911 call. It would be traceable. This court's familiar with technology. People engage in swatting. I can borrow somebody's cell phone. People use burner phones. Whether or not a 911 call is potentially traceable does not make it more reliable. And this court and, again, the Supreme Court has said over and over, that's not enough. I mean, you could give a fake name, too. I mean, that would throw out the entire category of anonymous versus non-anonymous. I mean, he could call and say this is Joe Smith giving a report. You know, here's my phone number. Here's my address. Here's my Social Security number. And the argument you just made would have us say, well, none of that gives it reliability because you could make all that up. That could all be fake. That is a possibility, Judge. But this court understands that when a person provides their name and their phone number, and the court acknowledged that in the Kehoe decision, that a person is putting themselves in a position to potentially be contacted again. Well, then why isn't it the same thing with a traceable phone number on a 911 call? We just simply don't know where that phone number would be traced to. For example, I could, again, borrow. Trace to what he called from. Potentially, Judge. But the problem is we don't know if that's the person who's making the call. Again, I can borrow someone's phone. I mean, I don't want you to get stuck on this. But, I mean, you could raise the same argument about what you just said is reliable when someone gives their name and their phone number. Yes, Judge. So that seems to be kind of an over-argument. Insofar as the court has that concern, this court has actually drawn the distinction for us. The court has recognized that where somebody identifies themselves, that gives an indicia of reliability that we look to when someone makes a 911 call that we simply don't have here. We would ask that this court reverse the district court's rulings and remand. Thank you. All right. Thank you. And we also thank you for your work, Ms. Ascari, on behalf of Mr. Williams and Ms. Wood for your work on behalf of the government. And we'll come down in Greek Council and adjourn court until tomorrow morning. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Stephanie D. Thacker, Allison J. Rushing, DeAndrea Gist Benjamin